IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

TRIANGLE PARK, LLC,                              08-CV-1256-BR

        Plaintiff,
                                                 OPINION AND ORDER

v.

INDIAN HARBOR INSURANCE
COMPANY,

        Defendant.


**STEPHEN M. FELDMAN**
Perkins Coie, LLP
1120 N.W. Couch Street
10th Floor
Portland, OR 97209-4128
(503) 727-2058

        Attorneys for Plaintiff

**JOHN LORING LANGSLET**
Martin Bischoff Templeton Langslet & Hoffman
888 S.W. Fifth Avenue
Suite 900
Portland, OR 97204
(503) 224-3113


1 - OPINION AND ORDER

**MAX H. STERN**
**JESSICA E. LA LONDE**
Duane Morris, LLP
Spear Tower, Suite 2000
One Market
San Francisco, CA 94105-1104
(415) 957-3000

       Attorneys for Defendant

**BROWN, Judge.**

       This matter comes before the Court on Defendant Indian Harbor Insurance Company's Motion (#70) to Strike Declaration of Kathryn Silva Filed by Triangle Park, LLC, and on that portion of Plaintiff Triangle Park, LLC's Motion (#23) to Compel production of the communications between Defendant Indian Harbor and the law firm of Duane Morris before the denial of coverage and internal Indian Harbor communications concerning pre-denial communications with Duane Morris.

       For the reasons that follow, the Court **GRANTS** Defendant's Motion to Strike and **DENIES** that part of Plaintiff's Motion to Compel as to Plaintiff's request for production of the communications between Defendant Indian Harbor and the law firm of Duane Morris prior to the denial of coverage and internal Indian Harbor communications concerning pre-denial communications with Duane Morris.

2 - OPINION AND ORDER

**FINDINGS OF FACT**

The Court finds the following facts by a preponderance of the evidence:

From May 1997 to December 2008 Plaintiff owned property at 5828 North Van Houten Place, Portland, Oregon.

In December 2000 Plaintiff received a General Notice Letter (GNL) from the United States Environmental Protection Agency (EPA) notifying Plaintiff "of potential liability, as defined by Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(a), as amended (CERCLA), with respect to" the North Van Houten Place property.

On June 14, 2005, Plaintiff purchased a Pollution and Remediation Legal Liability Policy from Defendant covering the period from June 14, 2005, through June 14, 2015.

On August 9, 2006, Plaintiff received a "Supplemental Notice of Potential Liability" from the EPA as to the North Van Houten Place property in which the EPA "confirm[ed Plaintiff's] potential responsibility for response costs incurred and to be incurred in the Portland Harbor Superfund Site." The EPA proposed "to resolve [Plaintiff's] liability through a peripheral party cashout settlement under CERCLA Section 122(h), 42 U.S.C. § 9622(h)."

On October 16, 2006, Plaintiff notified Defendant by letter of "the claim being made against Plaintiff" by the EPA. On

3 - OPINION AND ORDER

October 27, 2006, Defendant acknowledged receipt of Plaintiff's notification and advised Plaintiff that "it does not appear that coverage will be afforded for this claim because the claim was first made in December 2000, which is prior to the inception of the policy."  Nevertheless, Defendant's "investigation of coverage [was] continuing and a final coverage determination [had not] been made."

On that same date, Etienne Maumus, the insurance claims adjuster handling Plaintiff's claim, telephoned Kathryn Silva, in-house counsel for Plaintiff to inform her of Defendant's preliminary decision.  According to Maumus, Silva informed Maumus that during the underwriting process Plaintiff had advised the underwriter about the December 2000 letter from the EPA and that Plaintiff sought insurance specifically because of the potential liability indicated in the EPA's December 2000 letter.[1]  Silva, therefore, disputed Defendant's preliminary decision.

On October 27, 2006, Silva also emailed Maumus to memorialize their conversation, to inform Maumus that Plaintiff had obtained a one-week extension from the EPA to negotiate a settlement, and to advise Maumus that Plaintiff understood Maumus's telephone call to mean that Defendant did not intend to participate in the settlement negotiations with the EPA.  Silva

---

[1] The Court admitted Maumus's testimony on this point for the sole purpose of establishing Maumus's state of mind.

4 - OPINION AND ORDER

concluded the email with the statement:  "Please be advised that if Triangle Park's liability to the EPA ultimately exceeds our deductible, Triangle Park will expect coverage, and will initiate litigation to receive such coverage, if necessary."

As a result of his conversation with Silva, on October 27, 2006, Maumus recommended to his supervisor, Robert McMahon, that Defendant retain outside coverage counsel because it appeared to Maumus that Plaintiff was threatening litigation and that there seemed to be an issue as to whether the underwriter was aware of the December 2000 EPA letter at the time the policy at issue was underwritten.  McMahon agreed Defendant should retain outside counsel.

On the following Monday (October 30, 2006), Maumus retained Max Stern of the law firm of Duane Morris to act as outside counsel.  On November 1, 2006, Maumus sent the claim file to Stern.

Stern testified he understood Defendant retained him

> because there was a challenge to the legal
> question of whether a type of PRP - EPA PRP letter
> known as a general notice letter constituted a
> claim under the policy, and also because there was
> a claim that this was the type of policy -- excuse
> me, that this claim was the type of claim for
> which the policy had been purchased, so that there
> was an issue of notwithstanding what we think of
> as normal insurance coverage issues, there was an
> ability to enforce the policy provisions.  But
> more than just legal advice analysis, because it
> was an issue of concern that they're going to sue
> us, I was sort of hired as a legal advisor to tell
> them how they should react and give my best advice

on how to navigate these waters.

Tr. 138.

On December 4, 2006, Silva advised Defendant in a letter that Plaintiff believed Defendant's preliminary denial of coverage was "without merit" because the December 2000 letter from the EPA did not constitute a claim within the meaning of the policy.  Silva also advised that Plaintiff believed Defendant's contention that the December 2000 letter constituted a claim under the policy "is inconsistent with the parties' understanding during the underwriting process and, if the contention were true, it would directly undermine the coverage that Triangle Park was led to believe it was purchasing."  Feldman Decl., Ex. 5 at 2. Silva asserted it "was made clear to the lead underwriter (namely Greg Leinweber), one of the primary purposes for obtaining the Policy was to protect Triangle Park in the event that the EPA made a CERCLA claim against it for environmental clean-up costs associated with the Site."  *Id*.  Silva further asserted Leinweber and others were made aware of Plaintiff's status as a possible "potentially responsible party" (PRP) during the underwriting process.  *Id*.  Silva urged Defendant "to carefully consider the matters discussed . . . and to complete your coverage analysis as quickly as possible."  *Id*. at 3.

On December 7, 2006, Stern wrote Silva informing her that Duane Morris was acting as "coverage counsel" and requesting she

6 - OPINION AND ORDER

"send all future communications regarding this matter" to Duane
Morris.  Feldman Decl., Ex. 6 at 1.  Stern noted Defendant would
"continue to investigate and evaluate this matter" and hoped "to
provide Triangle Park with a coverage determination as soon as
possible." *Id*. at 1-2.  To that end, Stern requested further
documents and information from Plaintiff.

Between December 11, 2006, and July 2007, Plaintiff and
Defendant continued to correspond through Stern.  Plaintiff also
continued to seek a coverage determination, to insist the
December 2000 EPA letter was not a claim, and to assert the
underwriter was aware of the December 2000 EPA letter at the time
the policy was underwritten.  Defendant also continued to seek
documents, including the files of Durham & Bates, the
organization that brokered the purchase of the insurance policy
at issue.

On June 25, 2007, Silva sent Duane Morris a letter enclosing
a copy of the Declaration of David Paez,[2] one of the Durham &
Bates brokers who assisted Plaintiff in obtaining the policy.
Silva characterized Paez's testimony as follows:  Paez informed
Leinweber before issuance of the policy that the property was
located within the Portland Harbor Superfund Site and that
Plaintiff had received the December 2000 EPA letter.  Silva also

---

[2] Paez's Declaration is not attached to the copy of the
letter filed with the Court and is not otherwise part of the
record.

7 - OPINION AND ORDER

advised Duane Morris that Defendant was provided with documentation confirming that the property was located within the Superfund Site during the underwriting process.

In December 2007 the parties agreed Defendant could review the Durham & Bates files pursuant to a confidentiality agreement.

On February 1, 2008, Defendant issued a final coverage determination informing Plaintiff that it was denying coverage for Plaintiff's claim related to the North Van Houten Place property because the EPA's claim against Plaintiff "was first made in December 2000, when [the EPA] sent its initial PRP letter[, and,] therefore, the EPA's claim was not first made during the policy period."  Defendant also informed Plaintiff that, pursuant to their investigation, Defendant concluded Paez's testimony "does not comport with the recollection of the Indian Harbor representatives or with Indian Harbor's records. Moreover, this statement is not confirmed by any contemporaneous evidence in the broker file."

Plaintiff subsequently investigated and proceeded to defend itself against the EPA's claim.  In March 2008 Plaintiff informed Defendant that Plaintiff intended to accept the EPA's settlement demand.  Following approval of the settlement by the United States Department of Justice (USDOJ), Plaintiff, the EPA, and the USDOJ executed a settlement agreement.

On October 24, 2008, Plaintiff filed a Complaint in this

Court against Defendant Indian Harbor; XL Capital, LTD; XL
Speciality Insurance Company; and XL Environmental, Inc.,
alleging claims for breach of contract, breach of duty of good
faith and fair dealing, breach of fiduciary duty, fraudulent
misrepresentation, and negligent misrepresentation.

After a mandatory public comment period, Plaintiff, the EPA,
and the USDOJ finalized a settlement agreement on December 17,
2008.

On March 24, 2009, Plaintiff filed a First Amended Complaint
asserting the same claims as in its original Complaint, but
removing XL Capital, LTD; XL Speciality Insurance Company; and XL
Environmental, Inc., as Defendants.


**PROCEDURAL BACKGROUND**

On February 24, 2010, Plaintiff filed a Motion to Compel
Production of Documents in which it sought an order compelling
Defendant to produce:

1. Communications between Defendant and the law
   firm of Duane Morris prior to the denial of
   coverage and internal Indian Harbor
   communications concerning pre-denial
   communications with Duane Morris,

2. Information relating to reserves set by
   Defendant,

3. Reinsurance Information,

4. Information relating to whether Indian Harbor
   has previously construed general notice
   letters of the sort received by Plaintiff to

9 - OPINION AND ORDER

be claims under the policy, and

5.    Promised, but not-yet-produced, documents.

On February 26, 2010, Defendant filed a Cross-Motion to Compel the following documents from Plaintiff:

1.    Unredacted copies of the Perkins Coie bills produced by Plaintiff that "allegedly substantiate" some of Plaintiff's damages,

2.    All correspondence and other items on the privilege log that are described as "regarding negotiations with EPA,"

3.    Letters from the EPA to other Zidell Companies and those companies' letters to their brokers and/or insurers regarding the EPA letter(s),

4.    A signed copy of the December 2000 letter Plaintiff received from the EPA,

5.    Correspondence between Plaintiff (or its agents) and insurers/brokers regarding the letters Plaintiff received in December 2000,

6.    Correspondence between Plaintiff (or its agents) and the EPA regarding any letters sent by the EPA in December 2000, and

7.    Evidence of payment of legal fees.

On March 9, 2010, the Court entered an Order directing the parties to confer in an effort to narrow the issues in dispute and to file a joint statement itemizing their outstanding discovery issues.

On March 15, 2010, the parties filed a Joint Statement advising the Court that the following issues still required resolution by the Court:

10 - OPINION AND ORDER

     1.    Plaintiff's request for Defendant to produce communications between Defendant and the law firm of Duane Morris prior to the denial of coverage and internal Indian Harbor communications concerning pre-denial communications with Duane Morris,

     2.    Defendant's request for Plaintiff to produce all correspondence and other items on the privilege log that are described as "regarding negotiations with EPA," and

     3.    Defendant's request for Plaintiff to produce letters from the EPA to other Zidell Companies and those companies' letters to their brokers and/or insurers regarding the EPA letter(s).

On March 31, 2010, the Court held a hearing on the unresolved issues at which it denied Defendant's request to compel production of letters from the EPA to other Zidell companies and the other Zidell companies' letters to their brokers and/or insurers regarding the EPA letter(s), took under advisement Defendant's request for all correspondence and other items on the privilege log "regarding negotiations with EPA," and set an evidentiary hearing as to Plaintiff's remaining request for communications between Defendant and Duane Morris before the denial of coverage and Defendant's internal communications concerning pre-denial communications with Duane Morris.

On May 3, 2010, the Court issued an Opinion and Order in which it denied Defendant's Motion as to its request for all correspondence and other items on the privilege log "regarding negotiations with EPA."

On May 5, 2010, the Court held an evidentiary hearing

11 - OPINION AND ORDER

regarding Plaintiff's Motion in which Plaintiff requested the production of "communications between Defendant and the law firm of Duane Morris prior to the denial of coverage and internal Indian Harbor communications concerning pre-denial communications with Duane Morris."  Maumus, McMahon, and Stern testified at the hearing.  Defendant also produced copies of the documents at issue for the Court's *in camera* review.

The Court directed the parties to file simultaneous supplemental briefs summarizing the parties' arguments and limited the length of each brief to ten pages.  On May 24 and 27, 2010, the parties filed their Supplemental Briefs.  On June 2, 2010, Defendant filed a Motion to Strike the Declaration of Kathryn Silva submitted with Plaintiff's Supplemental Brief.  The Court directed Plaintiff to file a response to Defendant's Motion to Strike and took all of the pending issues under advisement on June 18, 2010.

## DEFENDANT'S MOTION TO STRIKE DECLARATION OF KATHRYN SILVA

Defendant moves to strike the Declaration of Kathryn Silva on the grounds that the Court specifically prohibited submission of new evidence with the parties' supplemental briefing and that the Declaration is an "end run" around the Court's ten-page limit for the supplemental briefing.  The Court agrees.

As noted, the Court specifically advised the parties not to

12 - OPINION AND ORDER

submit new evidence with their supplemental filings, and Silva's Declaration contains new evidence.  In addition, the Court set a ten-page limit on the parties' supplemental briefing, and Silva's Declaration effectively expands the length of Plaintiff's Supplemental Brief.

Accordingly, the Court **GRANTS** Defendant's Motion to Strike.

### <u>PLAINTIFF'S MOTION TO COMPEL</u>

As noted, Plaintiff moves to compel production of communications between Defendant and Duane Morris prior to Defendant's February 1, 2008, denial of coverage in addition to Defendant's internal communications concerning pre-denial communications with Duane Morris.  Defendant contends these materials are protected by attorney-client and/or work-product privilege.

### <u>Standards</u>

A federal court sitting in diversity applies federal procedural law and the substantive law of the forum state.  *HSS Enter., LCC v. Amco Ins. Co.*, No. C06-1485-JPD, 2008 WL 163669, at *3 (W.D. Wash. Jan. 14, 2008)(citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), and *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)).  The attorney-client privilege is a substantive evidentiary privilege, and, therefore, it is governed by state law.  *See* Fed. R. Evid. 501.  *See also*

13 - OPINION AND ORDER

*Lexington Ins. Co. v. Swanson*, 240 F.R.D. 662, 666 (W.D. Wash. 2007).  The work-product privilege, on the other hand, is a procedural immunity, and, therefore, it is governed by the Federal Rules of Civil Procedure.  *See Union Pac. R. Co. v. Mower*, 219 F.3d 1069, 1077 n.8 (9th Cir. 2000).  *See also United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir. 1988)).

## I.    **Attorney-client privilege**.

Oregon Rule of Evidence 503(2)(a) provides in pertinent part:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:  (a) Between the client . . . and the client's lawyer.

Oregon courts, therefore, have held

> to successfully invoke the attorney-client privilege, the person seeking to exclude the evidence must show that (1) the communication is confidential within the meaning of OEC 503(1)(b), (2) the communication was made for the purpose of facilitating the rendition of professional legal services to the client, and (3) the communication was between persons described in OEC 503(2)(a) through (e)).

*State v. Jenkins*, 190 Or. App. 542, 547 (2003)(citing *State v. Jancsek*, 302 Or. 270, 275 (1986)).

The party asserting the privilege has the burden to establish that the privilege applies.  *See Goldsborough v. Eagle Crest Partners, Ltd.*, 314 Or. 336, 339 (1992).

14 - OPINION AND ORDER

## II.   Work-product privilege.

Federal Rule of Civil Procedure 26(b)(1) provides in

pertinent part:

> Parties may obtain discovery regarding any
> nonprivileged matter that is relevant to any
> party's claim or defense. . . .  For good cause,
> the court may order discovery of any matter
> relevant to the subject matter involved in the
> action.  Relevant information need not be
> admissible at the trial if the discovery appears
> reasonably calculated to lead to the discovery of
> admissible evidence.

Rule 26(b)(3) provides in pertinent part:

> (A)  Documents and Tangible Things.  Ordinarily, a
> party may not discover documents and tangible
> things that are prepared in anticipation of
> litigation or for trial by or for another party or
> its representative (including the other party's
> attorney, consultant, surety, indemnitor, insurer,
> or agent).  But, subject to Rule 26(b)(4), those
> materials may be discovered if:
>
> (I)  they are otherwise discoverable under
> Rule 26(b)(1); and
>
> (ii) the party shows that it has substantial
> need for the materials to prepare its case and
> cannot, without undue hardship, obtain their
> substantial equivalent by other means.
>
> (B)  Protection Against Disclosure.  If the court
> orders discovery of those materials, it must
> protect against disclosure of the mental
> impressions, conclusions, opinions, or legal
> theories of a party's attorney or other
> representative concerning the litigation.

"The privilege protects 'trial preparation materials that

reveal an attorney's strategy, intended lines of proof,

evaluation of strengths and weaknesses, and inferences drawn from

interviews.'"  *HSS Enter.*, 2008 WL 163669, at *4 (citing *Heath v. F/V ZOLOTOI*, 221 F.R.D. 545, 549 (W.D. Wash. 2004)).  "The party asserting the work product doctrine has the burden of establishing, for each document, the rule's application."  *Id.* (citations omitted).

## Discussion

It is undisputed that when an insurance company uses an attorney to conduct its basic or usual claims adjusting or handling process, communications to and from the attorney and the insurance company in that context are not protected by either attorney-client or work-product privilege.  *See, e.g., Chi. Meat Processors, Inc. v. Mid-Century Ins. Co.*, No. 95 C 4277, 1996 WL 172148, at *3 (N.D. Ill. Apr. 10, 1996); *Mission Nat'l Ins. Co. v. Lilly*, 112 F.R.D. 160, 163 (D. Minn. 1986)("To the extent that [outside counsel] acted as claims adjusters, then, their work-product, communications to client, and impressions about the facts will be treated herein as the ordinary business of [the insurer], outside the scope of the asserted privileges."); *Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 671 (S.D. Ind. 1991); *First Aviation Serv., Inc. v. Gulf Ins*. Co., 205 F.R.D. 65, 68-69 (D. Conn. 2001); *St. Paul Reinsurance Co., Ltd v. Commercial Fin. Corp.*, 197 F.R.D. 620, 637-39 (N.D. Iowa 2000); *Western Nat'l Bank of Denver v. Employers Ins. of Wausau*, 109 F.R.D. 55, 57 (D. Col. 1985).

"Most courts have held that documents constituting any part of a factual inquiry into or evaluation of a claim, undertaken in order to arrive at a claim decision, are [generated] in the ordinary course of an insurer's business and [are] not work product" even if this inquiry or evaluation was undertaken by an attorney. *Harper*, 138 F.R.D. at 662. "An insurance company may not insulate itself from discovery by hiring an attorney to conduct ordinary claims investigations." *First Aviation Serv.*, 205 F.R.D. at 69 (internal quotation marks omitted). As the court in *Chicago Meat Processors* explained:

> The public policy issue behind this result is that insurance companies, which are in the business of reviewing, processing and adjusting claims, should not be permitted to insulate the factual findings of its claims investigation by the involvement of an attorney to perform such work. Therefore, the factual results of such an investigation are discoverable in cases challenging the denial of the claim, to the same extent as if such factual investigation were conducted by its own adjusters or claims department.

1996 WL 172148, at *3.

Here Plaintiff contends Defendant hired Duane Morris to act as a claims adjuster and to perform an ordinary business function for Defendant, and, therefore, Defendant's communications to and about Duane Morris are not protected by the attorney-client or work-product privilege. Defendant, in turn, contends it hired Duane Morris in anticipation of litigation for the purpose of "facilitating the rendition of professional legal services" and

to perform legal analysis rather than to act as Defendant's claims adjuster in this matter.  According to Defendant, therefore, its communications to and about Duane Morris are protected as attorney-client or work-product privilege.

**I.  Analysis**

    **A.  Court will apply the case-by-case method of analysis to determine whether Defendant hired Duane Morris in "anticipation of litigation" and/or for the purpose of "facilitating the rendition of professional legal services."**

Plaintiff contends Defendant did not hire Duane Morris in anticipation of litigation and/or for the purpose of "facilitating the rendition of professional legal services" because Defendant could not have legitimately feared litigation or hired Duane Morris in preparation for litigation before Defendant issued its final denial-of-coverage letter in February 2008.  Plaintiff relies on a number of cases in which courts have taken a bright-line approach to this issue and have held insurance companies do not hire counsel "in anticipation of litigation" until they have issued final denial letters.  *See, e.g., Taroli v. Gen. Elec. Co.*, 114 F.R.D. 97, 99 (N.D. Ind. 1987), and *Carver v. Allstate Ins. Co.*, 94 F.R.D. 131, 134 (D. Ga. 1982).  Defendant, on the other hand, relies on cases in which courts have taken a case-by-case approach to resolve this issue.  *See, e.g., Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 663-64 (S.D. Ind. 1991).

18 - OPINION AND ORDER

This Court finds a case-by-case analysis is a better approach.  As the District Court for the Western District of Washington noted, "In the insurance context, the question of whether a communication falls within the attorney-client privilege can often be a difficult one because of the investigatory nature of the insurance business.  The line between what constitutes claim handling and the rendition of legal advice is often more cloudy than crystalline."  *HSS Enter.*, 2008 WL 163669, at *3 (citations omitted).

**B.    Analysis of the evidence regarding anticipation of litigation.**

In *Harper*, the court noted

> because litigation can be anticipated, in a general sense, at the time almost any incident occurs-thus closing off much pertinent discovery-courts have interpreted the Rule to require a more substantial and specific threat of litigation before a party's anticipation will be considered a reasonable and justifiable motivating force.  There are many formulations of this level of threat, but the cases generally concur that a party must show more than a "remote prospect," an "inchoate possibility," or "a likely chance" of litigation.  *Mission National Insurance Company v. Lilly*, 112 F.R.D. 160, 163 (D. Minn. 1986); *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 604 (8th Cir. 1977); *Airheart v. Chicago and North Western Transportation Company*, 128 F.R.D. 669, 671 (D.S.D. 1989).  Rather, a party must demonstrate that "at the very least some articulable claim, likely to lead to litigation" had arisen, *Binks*, 709 F.2d at 1119, quoting *Coastal States Gas Corporation v. Department of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980), that the probability of litigation is "substantial and imminent", *Carver*, 94 F.R.D. at 134; *Home Insurance Company v. Ballenger Corporation*, 74

> F.R.D. 93, 101 (N.D. Ga. 1977), "objective facts
> establishing an identifiable resolve to litigate",
> *Binks*, 709 F.2d at 1119, or "an identifiable
> specific claim or impending litigation when the
> materials were prepared", *Leonen v. Johns-
> Manville*, 135 F.R.D. 94, 97 (D.N.J. 1990).

*Id.* at 659.

Here Maumus testified he believed Plaintiff was
threatening litigation when Silva spoke with him in October 2006.
According to Maumus, Silva became "contentious" because she
believed the December 2000 EPA letter was the reason that
Plaintiff had purchased the policy at issue and that the
underwriter was informed about the EPA letter before the policy
was issued.  Maumus testified he "felt certain" that Plaintiff
intended to litigate if Defendant denied coverage based on
Silva's October 2006 letter in which she stated "if Triangle
Park's liability to the EPA ultimately exceeds our deductible,
Triangle Park will expect coverage, and will initiate litigation
to receive such coverage, if necessary."

Maumus testified it was unlikely that he would change
his initial coverage determination in light of the language of
the policy and the December 2000 EPA letter unless it was
discovered that the underwriter knew about the EPA letter before
Defendant issued the policy.  Maumus and Stern both testified
that, between Defendant's October 2006 preliminary coverage
denial and Defendant's February 2008 final coverage denial, Duane
Morris was mainly evaluating Plaintiff's allegations that

20 - OPINION AND ORDER

Defendant's underwriters were aware of the December 2000 EPA letter as well as the possible consequences to coverage if, in fact, the underwriters had such knowledge.

On this record, the Court finds even though Defendant stated in numerous letters that it was continuing to investigate Plaintiff's claim, it was not unreasonable for Defendant to believe at the same time that Plaintiff would initiate litigation if Defendant did not change its initial denial of coverage and for Defendant to realize that it was unlikely to change its position absent evidence that its underwriters were aware of the December 2000 EPA letter at the time the policy was issued. Moreover, Defendant's repeated statements that it was continuing to consider the matter were more likely an effort to protect itself from future assertions that it had denied coverage wrongfully than an indication that it did not actually anticipate litigation. The Court, therefore, concludes Defendant hired Duane Morris in October/November 2006 in anticipation of litigation.

**C.    Analysis of the evidence regarding facilitation of the rendition of professional legal services.**

As noted, Plaintiff contends Duane Morris was acting as a claims adjuster rather than an entity rendering professional legal services to Defendant, and, therefore, the documents sought by Plaintiff are not protected by attorney-client privilege. Plaintiff relies on a number of cases in which courts have held

21 - OPINION AND ORDER

attorneys retained by insurance companies are not protected by attorney-client privilege.  The Court, however, finds these cases are distinguishable.

For example, in *HSS Enterprises*, the insurance company did not deny that it retained the Brady law firm "to assist in investigating and adjusting plaintiff's fire loss claim." *Id.*, at *4.  The insurance company, however, retained the Betts Patterson law firm to defend likely coverage litigation with the plaintiff.  *Id.*, at *2.  The plaintiff sought only the insurance company's communications with the Brady law firm.  The court, therefore, did not address communications with the Betts Patterson law firm.

Similarly, in *Bronsink v. Allied Property and Casualty Ins.*, No. 09-751 MJP, 2010 WL 786016, at *1 (W.D. Wash. Mar. 4, 2010), the attorney at issue "assisted with claims investigation."

In *Mission National Insurance Company v. Lilly*, 112 F.R.D. 160, 162 (D. Minn. 1986), the insurance company routinely and "as a matter of course" employed a law firm to conduct its claims-adjustment investigations.  The court concluded the law firm in that case was acting as "an ordinary businessman" rather than as an attorney, and, therefore, the court held the insurance company's communications with the law firm were not protected by attorney-client privilege.  *Id.* at 163.

Here the Court's review of the *in camera* documents corroborates the Court's conclusion that Duane Morris was hired for "the purpose of facilitating the rendition of professional legal services" to Defendant rather than to render the services of a claims adjuster.  It was Maumus and not Duane Morris who was acting as Defendant's claims adjuster when Maumus examined the language of the four corners of the policy in light of the fact that Plaintiff had received the December 2000 General Notice Letter from the EPA.  Maumus's initial conclusion was that the December 2000 letter was a claim within the meaning of the policy.  Stern, however, conducted legal analysis and made legal recommendations beyond interpretation of the four corners of the policy.

On this record, the Court concludes the communications between Defendant and Duane Morris before Defendant's February 1, 2008, denial of coverage and Defendant's internal communications concerning pre-denial communications with Duane Morris are protected by attorney-client privilege.  Accordingly, the Court **DENIES** Plaintiff's Motion to Compel as to these documents because they are so privileged.  Because the attorney-client privilege protects these materials from discovery, the Court need not further address Defendant's contention that they are also protected by the work-product privilege.

## <u>CONCLUSION</u>

For these reasons, the Court **GRANTS** Defendant's Motion (#70) to Strike Declaration of Kathryn Silva Filed by Triangle Park, LLC, and **DENIES** that part of Plaintiff's Motion (#23) to Compel as to Plaintiff's request for communications between Defendant and Duane Morris before the denial of coverage and Defendant's internal communications concerning pre-denial communications with Duane Morris.

IT IS SO ORDERED.

DATED this 22nd day of July, 2010.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


TRIANGLE PARK, LLC,                              08-CV-1256-BR

       Plaintiff,

                                      OPINION AND ORDER

v.

INDIAN HARBOR INSURANCE
COMPANY,

       Defendant.


STEPHEN M. FELDMAN
Perkins Coie, LLP
1120 N.W. Couch Street
10th Floor
Portland, OR 97209-4128
(503) 727-2058

        Attorneys for Plaintiff

JOHN LORING LANGSLET
Martin Bischoff Templeton Langslet & Hoffman
888 S.W. Fifth Avenue
Suite 900
Portland, OR 97204
(503) 224-3113


1 - OPINION AND ORDER

**MAX H. STERN**
**JESSICA E. LA LONDE**
Duane Morris, LLP
Spear Tower, Suite 2000
One Market
San Francisco, CA 94105-1104
(415) 957-3000

       Attorneys for Defendant

**BROWN, Judge.**

       This matter comes before the Court on Defendant Indian Harbor Insurance Company's Motion (#70) to Strike Declaration of Kathryn Silva Filed by Triangle Park, LLC, and on that portion of Plaintiff Triangle Park, LLC's Motion (#23) to Compel production of the communications between Defendant Indian Harbor and the law firm of Duane Morris before the denial of coverage and internal Indian Harbor communications concerning pre-denial communications with Duane Morris.

       For the reasons that follow, the Court **GRANTS** Defendant's Motion to Strike and **DENIES** that part of Plaintiff's Motion to Compel as to Plaintiff's request for production of the communications between Defendant Indian Harbor and the law firm of Duane Morris prior to the denial of coverage and internal Indian Harbor communications concerning pre-denial communications with Duane Morris.

2 - OPINION AND ORDER

## FINDINGS OF FACT

The Court finds the following facts by a preponderance of the evidence:

From May 1997 to December 2008 Plaintiff owned property at 5828 North Van Houten Place, Portland, Oregon.

In December 2000 Plaintiff received a General Notice Letter (GNL) from the United States Environmental Protection Agency (EPA) notifying Plaintiff "of potential liability, as defined by Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(a), as amended (CERCLA), with respect to" the North Van Houten Place property.

On June 14, 2005, Plaintiff purchased a Pollution and Remediation Legal Liability Policy from Defendant covering the period from June 14, 2005, through June 14, 2015.

On August 9, 2006, Plaintiff received a "Supplemental Notice of Potential Liability" from the EPA as to the North Van Houten Place property in which the EPA "confirm[ed Plaintiff's] potential responsibility for response costs incurred and to be incurred in the Portland Harbor Superfund Site."  The EPA proposed "to resolve [Plaintiff's] liability through a peripheral party cashout settlement under CERCLA Section 122(h), 42 U.S.C. § 9622(h)."

On October 16, 2006, Plaintiff notified Defendant by letter of "the claim being made against Plaintiff" by the EPA.  On

3 - OPINION AND ORDER

October 27, 2006, Defendant acknowledged receipt of Plaintiff's
notification and advised Plaintiff that "it does not appear that
coverage will be afforded for this claim because the claim was
first made in December 2000, which is prior to the inception of
the policy." Nevertheless, Defendant's "investigation of
coverage [was] continuing and a final coverage determination [had
not] been made."

On that same date, Etienne Maumus, the insurance claims
adjuster handling Plaintiff's claim, telephoned Kathryn Silva,
in-house counsel for Plaintiff to inform her of Defendant's
preliminary decision. According to Maumus, Silva informed Maumus
that during the underwriting process Plaintiff had advised the
underwriter about the December 2000 letter from the EPA and that
Plaintiff sought insurance specifically because of the potential
liability indicated in the EPA's December 2000 letter.[1] Silva,
therefore, disputed Defendant's preliminary decision.

On October 27, 2006, Silva also emailed Maumus to
memorialize their conversation, to inform Maumus that Plaintiff
had obtained a one-week extension from the EPA to negotiate a
settlement, and to advise Maumus that Plaintiff understood
Maumus's telephone call to mean that Defendant did not intend to
participate in the settlement negotiations with the EPA. Silva

---

[1] The Court admitted Maumus's testimony on this point for
the sole purpose of establishing Maumus's state of mind.

4 - OPINION AND ORDER

concluded the email with the statement:  "Please be advised that if Triangle Park's liability to the EPA ultimately exceeds our deductible, Triangle Park will expect coverage, and will initiate litigation to receive such coverage, if necessary."

As a result of his conversation with Silva, on October 27, 2006, Maumus recommended to his supervisor, Robert McMahon, that Defendant retain outside coverage counsel because it appeared to Maumus that Plaintiff was threatening litigation and that there seemed to be an issue as to whether the underwriter was aware of the December 2000 EPA letter at the time the policy at issue was underwritten.  McMahon agreed Defendant should retain outside counsel.

On the following Monday (October 30, 2006), Maumus retained Max Stern of the law firm of Duane Morris to act as outside counsel.  On November 1, 2006, Maumus sent the claim file to Stern.

Stern testified he understood Defendant retained him

> because there was a challenge to the legal question of whether a type of PRP – EPA PRP letter known as a general notice letter constituted a claim under the policy, and also because there was a claim that this was the type of policy -- excuse me, that this claim was the type of claim for which the policy had been purchased, so that there was an issue of notwithstanding what we think of as normal insurance coverage issues, there was an ability to enforce the policy provisions.  But more than just legal advice analysis, because it was an issue of concern that they're going to sue us, I was sort of hired as a legal advisor to tell them how they should react and give my best advice

on how to navigate these waters.

Tr. 138.

On December 4, 2006, Silva advised Defendant in a letter that Plaintiff believed Defendant's preliminary denial of coverage was "without merit" because the December 2000 letter from the EPA did not constitute a claim within the meaning of the policy. Silva also advised that Plaintiff believed Defendant's contention that the December 2000 letter constituted a claim under the policy "is inconsistent with the parties' understanding during the underwriting process and, if the contention were true, it would directly undermine the coverage that Triangle Park was led to believe it was purchasing." Feldman Decl., Ex. 5 at 2. Silva asserted it "was made clear to the lead underwriter (namely Greg Leinweber), one of the primary purposes for obtaining the Policy was to protect Triangle Park in the event that the EPA made a CERCLA claim against it for environmental clean-up costs associated with the Site." Id. Silva further asserted Leinweber and others were made aware of Plaintiff's status as a possible "potentially responsible party" (PRP) during the underwriting process. Id. Silva urged Defendant "to carefully consider the matters discussed . . . and to complete your coverage analysis as quickly as possible." Id. at 3.

On December 7, 2006, Stern wrote Silva informing her that Duane Morris was acting as "coverage counsel" and requesting she

6 - OPINION AND ORDER

"send all future communications regarding this matter" to Duane

Morris.  Feldman Decl., Ex. 6 at 1.  Stern noted Defendant would

"continue to investigate and evaluate this matter" and hoped "to

provide Triangle Park with a coverage determination as soon as

possible." *Id*. at 1-2.  To that end, Stern requested further

documents and information from Plaintiff.

Between December 11, 2006, and July 2007, Plaintiff and

Defendant continued to correspond through Stern.  Plaintiff also

continued to seek a coverage determination, to insist the

December 2000 EPA letter was not a claim, and to assert the

underwriter was aware of the December 2000 EPA letter at the time

the policy was underwritten.  Defendant also continued to seek

documents, including the files of Durham & Bates, the

organization that brokered the purchase of the insurance policy

at issue.

On June 25, 2007, Silva sent Duane Morris a letter enclosing

a copy of the Declaration of David Paez,[2] one of the Durham &

Bates brokers who assisted Plaintiff in obtaining the policy.

Silva characterized Paez's testimony as follows:  Paez informed

Leinweber before issuance of the policy that the property was

located within the Portland Harbor Superfund Site and that

Plaintiff had received the December 2000 EPA letter.  Silva also

---

[2] Paez's Declaration is not attached to the copy of the
letter filed with the Court and is not otherwise part of the
record.

advised Duane Morris that Defendant was provided with
documentation confirming that the property was located within the
Superfund Site during the underwriting process.

In December 2007 the parties agreed Defendant could review
the Durham & Bates files pursuant to a confidentiality agreement.

On February 1, 2008, Defendant issued a final coverage
determination informing Plaintiff that it was denying coverage
for Plaintiff's claim related to the North Van Houten Place
property because the EPA's claim against Plaintiff "was first
made in December 2000, when [the EPA] sent its initial PRP
letter[, and,] therefore, the EPA's claim was not first made
during the policy period." Defendant also informed Plaintiff
that, pursuant to their investigation, Defendant concluded Paez's
testimony "does not comport with the recollection of the Indian
Harbor representatives or with Indian Harbor's records.
Moreover, this statement is not confirmed by any contemporaneous
evidence in the broker file."

Plaintiff subsequently investigated and proceeded to defend
itself against the EPA's claim. In March 2008 Plaintiff informed
Defendant that Plaintiff intended to accept the EPA's settlement
demand. Following approval of the settlement by the United
States Department of Justice (USDOJ), Plaintiff, the EPA, and the
USDOJ executed a settlement agreement.

On October 24, 2008, Plaintiff filed a Complaint in this

Court against Defendant Indian Harbor; XL Capital, LTD; XL Speciality Insurance Company; and XL Environmental, Inc., alleging claims for breach of contract, breach of duty of good faith and fair dealing, breach of fiduciary duty, fraudulent misrepresentation, and negligent misrepresentation.

After a mandatory public comment period, Plaintiff, the EPA, and the USDOJ finalized a settlement agreement on December 17, 2008.

On March 24, 2009, Plaintiff filed a First Amended Complaint asserting the same claims as in its original Complaint, but removing XL Capital, LTD; XL Speciality Insurance Company; and XL Environmental, Inc., as Defendants.

## PROCEDURAL BACKGROUND

On February 24, 2010, Plaintiff filed a Motion to Compel Production of Documents in which it sought an order compelling Defendant to produce:

> 1.    Communications between Defendant and the law firm of Duane Morris prior to the denial of coverage and internal Indian Harbor communications concerning pre-denial communications with Duane Morris,
>
> 2.    Information relating to reserves set by Defendant,
>
> 3.    Reinsurance Information,
>
> 4.    Information relating to whether Indian Harbor has previously construed general notice letters of the sort received by Plaintiff to

be claims under the policy, and

    5.    Promised, but not-yet-produced, documents.

On February 26, 2010, Defendant filed a Cross-Motion to Compel the following documents from Plaintiff:

    1.    Unredacted copies of the Perkins Coie bills produced by Plaintiff that "allegedly substantiate" some of Plaintiff's damages,

    2.    All correspondence and other items on the privilege log that are described as "regarding negotiations with EPA,"

    3.    Letters from the EPA to other Zidell Companies and those companies' letters to their brokers and/or insurers regarding the EPA letter(s),

    4.    A signed copy of the December 2000 letter Plaintiff received from the EPA,

    5.    Correspondence between Plaintiff (or its agents) and insurers/brokers regarding the letters Plaintiff received in December 2000,

    6.    Correspondence between Plaintiff (or its agents) and the EPA regarding any letters sent by the EPA in December 2000, and

    7.    Evidence of payment of legal fees.

On March 9, 2010, the Court entered an Order directing the parties to confer in an effort to narrow the issues in dispute and to file a joint statement itemizing their outstanding discovery issues.

On March 15, 2010, the parties filed a Joint Statement advising the Court that the following issues still required resolution by the Court:

10 - OPINION AND ORDER

1.  Plaintiff's request for Defendant to produce communications between Defendant and the law firm of Duane Morris prior to the denial of coverage and internal Indian Harbor communications concerning pre-denial communications with Duane Morris,

2.  Defendant's request for Plaintiff to produce all correspondence and other items on the privilege log that are described as "regarding negotiations with EPA," and

3.  Defendant's request for Plaintiff to produce letters from the EPA to other Zidell Companies and those companies' letters to their brokers and/or insurers regarding the EPA letter(s).

On March 31, 2010, the Court held a hearing on the unresolved issues at which it denied Defendant's request to compel production of letters from the EPA to other Zidell companies and the other Zidell companies' letters to their brokers and/or insurers regarding the EPA letter(s), took under advisement Defendant's request for all correspondence and other items on the privilege log "regarding negotiations with EPA," and set an evidentiary hearing as to Plaintiff's remaining request for communications between Defendant and Duane Morris before the denial of coverage and Defendant's internal communications concerning pre-denial communications with Duane Morris.

On May 3, 2010, the Court issued an Opinion and Order in which it denied Defendant's Motion as to its request for all correspondence and other items on the privilege log "regarding negotiations with EPA."

On May 5, 2010, the Court held an evidentiary hearing

11 - OPINION AND ORDER

regarding Plaintiff's Motion in which Plaintiff requested the production of "communications between Defendant and the law firm of Duane Morris prior to the denial of coverage and internal Indian Harbor communications concerning pre-denial communications with Duane Morris."  Maumus, McMahon, and Stern testified at the hearing.  Defendant also produced copies of the documents at issue for the Court's *in camera* review.

The Court directed the parties to file simultaneous supplemental briefs summarizing the parties' arguments and limited the length of each brief to ten pages.  On May 24 and 27, 2010, the parties filed their Supplemental Briefs.  On June 2, 2010, Defendant filed a Motion to Strike the Declaration of Kathryn Silva submitted with Plaintiff's Supplemental Brief.  The Court directed Plaintiff to file a response to Defendant's Motion to Strike and took all of the pending issues under advisement on June 18, 2010.


## DEFENDANT'S MOTION TO STRIKE DECLARATION OF KATHRYN SILVA

Defendant moves to strike the Declaration of Kathryn Silva on the grounds that the Court specifically prohibited submission of new evidence with the parties' supplemental briefing and that the Declaration is an "end run" around the Court's ten-page limit for the supplemental briefing.  The Court agrees.

As noted, the Court specifically advised the parties not to

12 - OPINION AND ORDER

submit new evidence with their supplemental filings, and Silva's Declaration contains new evidence.  In addition, the Court set a ten-page limit on the parties' supplemental briefing, and Silva's Declaration effectively expands the length of Plaintiff's Supplemental Brief.

Accordingly, the Court **GRANTS** Defendant's Motion to Strike.


## PLAINTIFF'S MOTION TO COMPEL

As noted, Plaintiff moves to compel production of communications between Defendant and Duane Morris prior to Defendant's February 1, 2008, denial of coverage in addition to Defendant's internal communications concerning pre-denial communications with Duane Morris.  Defendant contends these materials are protected by attorney-client and/or work-product privilege.

### Standards

A federal court sitting in diversity applies federal procedural law and the substantive law of the forum state.  *HSS Enter., LCC v. Amco Ins. Co.*, No. C06-1485-JPD, 2008 WL 163669, at *3 (W.D. Wash. Jan. 14, 2008)(citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), and *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)).  The attorney-client privilege is a substantive evidentiary privilege, and, therefore, it is governed by state law.  *See* Fed. R. Evid. 501.  *See also*

13 - OPINION AND ORDER

*Lexington Ins. Co. v. Swanson*, 240 F.R.D. 662, 666 (W.D. Wash. 2007).  The work-product privilege, on the other hand, is a procedural immunity, and, therefore, it is governed by the Federal Rules of Civil Procedure.  *See Union Pac. R. Co. v. Mower*, 219 F.3d 1069, 1077 n.8 (9th Cir. 2000).  *See also United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir. 1988)).

**I.    Attorney-client privilege.**

Oregon Rule of Evidence 503(2)(a) provides in pertinent part:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:  (a) Between the client . . . and the client's lawyer.

Oregon courts, therefore, have held

> to successfully invoke the attorney-client privilege, the person seeking to exclude the evidence must show that (1) the communication is confidential within the meaning of OEC 503(1)(b), (2) the communication was made for the purpose of facilitating the rendition of professional legal services to the client, and (3) the communication was between persons described in OEC 503(2)(a) through (e)).

*State v. Jenkins*, 190 Or. App. 542, 547 (2003)(citing *State v. Jancsek*, 302 Or. 270, 275 (1986)).

The party asserting the privilege has the burden to establish that the privilege applies.  *See Goldsborough v. Eagle Crest Partners, Ltd.*, 314 Or. 336, 339 (1992).

14 - OPINION AND ORDER

## II.  Work-product privilege.

Federal Rule of Civil Procedure 26(b)(1) provides in pertinent part:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. . . .  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Rule 26(b)(3) provides in pertinent part:

> (A)  Documents and Tangible Things.  Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).  But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> (I)  they are otherwise discoverable under Rule 26(b)(1); and
>
> (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> (B)  Protection Against Disclosure.  If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

"The privilege protects 'trial preparation materials that reveal an attorney's strategy, intended lines of proof, evaluation of strengths and weaknesses, and inferences drawn from

15 - OPINION AND ORDER

interviews.'" *HSS Enter.*, 2008 WL 163669, at *4 (citing *Heath v. F/V ZOLOTOI*, 221 F.R.D. 545, 549 (W.D. Wash. 2004)).  "The party asserting the work product doctrine has the burden of establishing, for each document, the rule's application." *Id.* (citations omitted).

### Discussion

It is undisputed that when an insurance company uses an attorney to conduct its basic or usual claims adjusting or handling process, communications to and from the attorney and the insurance company in that context are not protected by either attorney-client or work-product privilege. *See, e.g., Chi. Meat Processors, Inc. v. Mid-Century Ins. Co.*, No. 95 C 4277, 1996 WL 172148, at *3 (N.D. Ill. Apr. 10, 1996); *Mission Nat'l Ins. Co. v. Lilly*, 112 F.R.D. 160, 163 (D. Minn. 1986)("To the extent that [outside counsel] acted as claims adjusters, then, their work-product, communications to client, and impressions about the facts will be treated herein as the ordinary business of [the insurer], outside the scope of the asserted privileges."); *Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 671 (S.D. Ind. 1991); *First Aviation Serv., Inc. v. Gulf Ins*. Co., 205 F.R.D. 65, 68-69 (D. Conn. 2001); *St. Paul Reinsurance Co., Ltd v. Commercial Fin. Corp.*, 197 F.R.D. 620, 637-39 (N.D. Iowa 2000); *Western Nat'l Bank of Denver v. Employers Ins. of Wausau*, 109 F.R.D. 55, 57 (D. Col. 1985).

"Most courts have held that documents constituting any part of a factual inquiry into or evaluation of a claim, undertaken in order to arrive at a claim decision, are [generated] in the ordinary course of an insurer's business and [are] not work product" even if this inquiry or evaluation was undertaken by an attorney. *Harper*, 138 F.R.D. at 662. "An insurance company may not insulate itself from discovery by hiring an attorney to conduct ordinary claims investigations." *First Aviation Serv.*, 205 F.R.D. at 69 (internal quotation marks omitted). As the court in *Chicago Meat Processors* explained:

> The public policy issue behind this result is that insurance companies, which are in the business of reviewing, processing and adjusting claims, should not be permitted to insulate the factual findings of its claims investigation by the involvement of an attorney to perform such work. Therefore, the factual results of such an investigation are discoverable in cases challenging the denial of the claim, to the same extent as if such factual investigation were conducted by its own adjusters or claims department.

1996 WL 172148, at *3.

Here Plaintiff contends Defendant hired Duane Morris to act as a claims adjuster and to perform an ordinary business function for Defendant, and, therefore, Defendant's communications to and about Duane Morris are not protected by the attorney-client or work-product privilege. Defendant, in turn, contends it hired Duane Morris in anticipation of litigation for the purpose of "facilitating the rendition of professional legal services" and

17 - OPINION AND ORDER

to perform legal analysis rather than to act as Defendant's claims adjuster in this matter.  According to Defendant, therefore, its communications to and about Duane Morris are protected as attorney-client or work-product privilege.

**I.    Analysis**

> **A.    Court will apply the case-by-case method of analysis to determine whether Defendant hired Duane Morris in "anticipation of litigation" and/or for the purpose of "facilitating the rendition of professional legal services."**

Plaintiff contends Defendant did not hire Duane Morris in anticipation of litigation and/or for the purpose of "facilitating the rendition of professional legal services" because Defendant could not have legitimately feared litigation or hired Duane Morris in preparation for litigation before Defendant issued its final denial-of-coverage letter in February 2008.  Plaintiff relies on a number of cases in which courts have taken a bright-line approach to this issue and have held insurance companies do not hire counsel "in anticipation of litigation" until they have issued final denial letters.  *See, e.g., Taroli v. Gen. Elec. Co.*, 114 F.R.D. 97, 99 (N.D. Ind. 1987), and *Carver v. Allstate Ins. Co.*, 94 F.R.D. 131, 134 (D. Ga. 1982).  Defendant, on the other hand, relies on cases in which courts have taken a case-by-case approach to resolve this issue.  *See, e.g., Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 663-64 (S.D. Ind. 1991).

18 - OPINION AND ORDER

This Court finds a case-by-case analysis is a better approach. As the District Court for the Western District of Washington noted, "In the insurance context, the question of whether a communication falls within the attorney-client privilege can often be a difficult one because of the investigatory nature of the insurance business. The line between what constitutes claim handling and the rendition of legal advice is often more cloudy than crystalline." *HSS Enter.*, 2008 WL 163669, at *3 (citations omitted).

**B.    Analysis of the evidence regarding anticipation of litigation.**

In *Harper*, the court noted

> because litigation can be anticipated, in a general sense, at the time almost any incident occurs-thus closing off much pertinent discovery-courts have interpreted the Rule to require a more substantial and specific threat of litigation before a party's anticipation will be considered a reasonable and justifiable motivating force. There are many formulations of this level of threat, but the cases generally concur that a party must show more than a "remote prospect," an "inchoate possibility," or "a likely chance" of litigation. *Mission National Insurance Company v. Lilly*, 112 F.R.D. 160, 163 (D. Minn. 1986); *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 604 (8th Cir. 1977); *Airheart v. Chicago and North Western Transportation Company*, 128 F.R.D. 669, 671 (D.S.D. 1989). Rather, a party must demonstrate that "at the very least some articulable claim, likely to lead to litigation" had arisen, *Binks*, 709 F.2d at 1119, quoting *Coastal States Gas Corporation v. Department of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980), that the probability of litigation is "substantial and imminent", *Carver*, 94 F.R.D. at 134; *Home Insurance Company v. Ballenger Corporation*, 74

> F.R.D. 93, 101 (N.D. Ga. 1977), "objective facts
> establishing an identifiable resolve to litigate",
> *Binks*, 709 F.2d at 1119, or "an identifiable
> specific claim or impending litigation when the
> materials were prepared", *Leonen v. Johns-
> Manville*, 135 F.R.D. 94, 97 (D.N.J. 1990).

*Id.* at 659.

Here Maumus testified he believed Plaintiff was threatening litigation when Silva spoke with him in October 2006. According to Maumus, Silva became "contentious" because she believed the December 2000 EPA letter was the reason that Plaintiff had purchased the policy at issue and that the underwriter was informed about the EPA letter before the policy was issued. Maumus testified he "felt certain" that Plaintiff intended to litigate if Defendant denied coverage based on Silva's October 2006 letter in which she stated "if Triangle Park's liability to the EPA ultimately exceeds our deductible, Triangle Park will expect coverage, and will initiate litigation to receive such coverage, if necessary."

Maumus testified it was unlikely that he would change his initial coverage determination in light of the language of the policy and the December 2000 EPA letter unless it was discovered that the underwriter knew about the EPA letter before Defendant issued the policy. Maumus and Stern both testified that, between Defendant's October 2006 preliminary coverage denial and Defendant's February 2008 final coverage denial, Duane Morris was mainly evaluating Plaintiff's allegations that

20 - OPINION AND ORDER

Defendant's underwriters were aware of the December 2000 EPA letter as well as the possible consequences to coverage if, in fact, the underwriters had such knowledge.

On this record, the Court finds even though Defendant stated in numerous letters that it was continuing to investigate Plaintiff's claim, it was not unreasonable for Defendant to believe at the same time that Plaintiff would initiate litigation if Defendant did not change its initial denial of coverage and for Defendant to realize that it was unlikely to change its position absent evidence that its underwriters were aware of the December 2000 EPA letter at the time the policy was issued. Moreover, Defendant's repeated statements that it was continuing to consider the matter were more likely an effort to protect itself from future assertions that it had denied coverage wrongfully than an indication that it did not actually anticipate litigation. The Court, therefore, concludes Defendant hired Duane Morris in October/November 2006 in anticipation of litigation.

**C.  Analysis of the evidence regarding facilitation of the rendition of professional legal services.**

As noted, Plaintiff contends Duane Morris was acting as a claims adjuster rather than an entity rendering professional legal services to Defendant, and, therefore, the documents sought by Plaintiff are not protected by attorney-client privilege. Plaintiff relies on a number of cases in which courts have held

21 - OPINION AND ORDER

attorneys retained by insurance companies are not protected by
attorney-client privilege.  The Court, however, finds these cases
are distinguishable.

In example, in *HSS Enterprises*, the insurance company
did not deny that it retained the Brady law firm "to assist in
investigating and adjusting plaintiff's fire loss claim."  *Id*.,
at *4.  The insurance company, however, retained the Betts
Patterson law firm to defend likely coverage litigation with the
plaintiff.  *Id*., at *2.  The plaintiff sought only the insurance
company's communications with the Brady law firm.  The court,
therefore, did not address communications with the Betts
Patterson law firm.

Similarly, in *Bronsink v. Allied Property and Casualty
Ins.*, No. 09-751 MJP, 2010 WL 786016, at *1 (W.D. Wash. Mar. 4,
2010), the attorney at issue "assisted with claims
investigation."

In *Mission National Insurance Company v. Lilly*, 112
F.R.D. 160, 162 (D. Minn. 1986), the insurance company routinely
and "as a matter of course" employed a law firm to conduct its
claims-adjustment investigations.  The court concluded the law
firm in that case was acting as "an ordinary businessman" rather
than as an attorney, and, therefore, the court held the insurance
company's communications with the law firm were not protected by
attorney-client privilege.  *Id*. at 163.

22 - OPINION AND ORDER

Here the Court's review of the *in camera* documents corroborates the Court's conclusion that Duane Morris was hired for "the purpose of facilitating the rendition of professional legal services" to Defendant rather than to render the services of a claims adjuster. It was Maumus and not Duane Morris who was acting as Defendant's claims adjuster when Maumus examined the language of the four corners of the policy in light of the fact that Plaintiff had received the December 2000 General Notice Letter from the EPA. Maumus's initial conclusion was that the December 2000 letter was a claim within the meaning of the policy. Stern, however, conducted legal analysis and made legal recommendations beyond interpretation of the four corners of the policy.

On this record, the Court concludes the communications between Defendant and Duane Morris before Defendant's February 1, 2008, denial of coverage and Defendant's internal communications concerning pre-denial communications with Duane Morris are protected by attorney-client privilege. Accordingly, the Court **DENIES** Plaintiff's Motion to Compel as to these documents because they are so privileged. Because the attorney-client privilege protects these materials from discovery, the Court need not further address Defendant's contention that they are also protected by the work-product privilege.

<u>**CONCLUSION**</u>

23 - OPINION AND ORDER

For these reasons, the Court **GRANTS** Defendant's Motion (#70) to Strike Declaration of Kathryn Silva Filed by Triangle Park, LLC, and **DENIES** that part of Plaintiff's Motion (#23) to Compel as to Plaintiff's request for communications between Defendant and Duane Morris before the denial of coverage and Defendant's internal communications concerning pre-denial communications with Duane Morris.

IT IS SO ORDERED.

DATED this 22nd day of July, 2010.

/s/ Anna J. Brown

_____

ANNA J. BROWN
United States District

24 - OPINION AND ORDER